## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| AMERIFIRST FINANCIAL, INC., *et al.*,[1] | Case No. 23-11240 (TMH) |
| Debtors. | (Jointly Administered) |
| The Official Committee of Unsecured Creditors of AMERIFIRST FINANCIAL, INC., *et al.*, on behalf of the estates of the Debtors,<br><br>Plaintiff,<br><br>v.<br><br>RCP CREDIT OPPORTUNITIES FUND LOAN SPV (FUND III), L.P. and RCP CUSTOMIZED CREDIT FUND (FUND IV-A), L.P.,<br><br>Defendants. | Adv. Proc. No. 25-_____ (TMH) |

## COMPLAINT

Plaintiff, the Official Committee of Unsecured Creditors[2] (the "Committee" or "Plaintiff")

of AmeriFirst Financial, Inc. and Phoenix 1040 LLC (together, the "Debtors"), in the

above-captioned chapter 11 cases (the "Chapter 11 Cases"), by and through its undersigned

counsel, submits this complaint (the "Complaint") on behalf of the Debtors' estates (the "Estates")

against RCP Credit Opportunities Fund Loan SPV (Fund III), L.P. and RCP Customized Credit

Fund (Fund IV-A), L.P. (collectively, "RCP"), and in support thereof alleges as follows:

---

1   The Debtors, along with the last four (4) digits of each Debtor's federal tax identification number are: Phoenix 1040 LLC (2550); and AmeriFirst Financial, Inc. (4557). The Debtors' service address is 575 W. Chandler Boulevard, Suite 225, Unit 236, Chandler, AZ 85225.

2   *See Notice of Appointment of Unsecured Creditors Committee* [Dkt. No. 122].

**NATURE OF THE ACTION**[3]

1.      This action arises from a scheme by RCP to elevate its debts in the Debtors' capital structure, assume control of the Debtors and ultimately, to destroy the Debtors by pushing them into liquidation.

2.      In late 2022, the Debtors were facing challenges caused by changes in the credit markets.  Faced with these challenges, the Debtors sought to consummate a restructuring with what they thought was a constructive partner.  Instead, RCP proved to be a predator with the unwavering goal to elevate the priority of the payments owed to it at the expense of the Debtors and other stakeholders.

3.      Restructuring any business can be challenging.  But for businesses, like AFI, that are highly dependent on the confidence of regulators, lenders and customers, financial distress can be particularly perilous and, if not carefully managed, can quickly destroy the underlying going concern.  Such was the case for AFI's mortgage business that could not exist without regulatory licenses and uninterrupted access to warehouse lines of credit to originate loans (the lifeblood of its business).

4.      Fully aware of these dynamics, RCP (a subordinated and unsecured lender to AFI) sought to exploit AFI's temporary struggles – caused by an unprecedented spike in interest rate hikes – to boost its subordinated status to become the senior secured lender in full control of AFI's business at the expense of AFI and all other stakeholders.  Through a series of inequitable and fraudulent maneuvers, RCP used a curable default to elevate itself to senior secured status and

---

[3]     Except as otherwise defined herein, capitalized terms shall have the meanings ascribed to them by the *Interim Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Dkt. No. 61] (the "Interim DIP Order"); however, for the avoidance of doubt, the Committee does not agree to any definition of any term in the Interim DIP Order to the extent that it purports to acknowledge the grant of perfected liens on any of the assets that are challenged in this Complaint.

obtained a release of substantial litigation claims against it based on fraudulent misrepresentations and in exchange for little or no benefit to AFI. It then swept (through its newly minted contractual rights and liens) virtually all cash to pay itself down more than $8 million and starving AFI of working capital that it needed to fund payroll and essential vendors before it ultimately took control of AFI's stock and caused the commencement of this Chapter 11 liquidation, in which it now again dangles the strings of DIP funding to obtain yet another release from this Court.

* * * * *

5. In 2022, the mortgage industry was negatively impacted by rising interest rates. RCP's loan to another mortgage company, Sprout Mortgage, defaulted and RCP learned how financial distress can affect an operation like AFI's. Ironically, AFI advised RCP on the Sprout situation and helped mitigate RCP's losses.

6. However, when AFI later had issues with its own net worth covenant, RCP did not return the favor. Instead, after misleading AFI to believe that RCP would permit a specific asset sale to cure the covenant default, RCP inexplicably noticed a default on December 2, 2022 (only one day after agreeing to a letter of intent for the asset sale) and informed AFI's senior warehouse lenders.

7. RCP knew the intended effect of its conduct: RCP's notice immediately disabled AFI's business. AFI's senior warehouse lenders ceased lending and accelerated their loans, and AFI's regulators scrutinized AFI's essential business licenses. AFI's business was effectively dead unless it could be carefully resurrected.

8. To exploit its ill-gotten leverage, RCP imposed a one-week deadline for AFI's senior lenders to consent to AFI selling assets to pay down RCP's loan ahead of their own. RCP

3

then pressured all other stakeholders through restructuring discussions that RCP permitted to continue through serial short-term forbearance extensions.

9.      RCP also augmented its influence over AFI by using this period to obtain more information on AFI's business and strict control over virtually every aspect of AFI's business.  It was clear that AFI would be unable to continue its business and its mortgage assets would diminish in value without a new warehouse loan.  Having paralyzed AFI's business, RCP knew that it could extract further concessions to benefit itself at the expense of all other stakeholders, while blocking AFI from obtaining a new warehouse loan.

10.     This was accomplished through a May 15, 2023 "settlement" between AFI and RCP that was outrageously one-sided and essentially orchestrated this Chapter 11 liquidation for the sole benefit of RCP in a cynical gambit to extract valuable releases for its bad faith conduct.

11.     The settlement, among other things:

- Released RCP for all of its prior conduct, including claims valued at $50 million to $100 million;

- Enhanced RCP's existing position by obtaining liens on AFI's assets, including new contractual cash concentration rights and a new deposit account control agreement that would provide RCP with lockbox control over AFI's cash (which RCP promptly used to repay itself more than $8 million);

- Pledged AFI's common stock to RCP so that it could take formal corporate governance control of AFI under any new default;

- Provided RCP with tight control of AFI's business through approved budgets and cash dominion;

- Provided RCP with formal information and consent rights, including with respect to the terms of new warehouse loans; and

- Required a $20 million payment in three months.

12.     RCP did not provide AFI with any new money or value.  The settlement provided AFI with little more than a short runway to accomplish the herculean task of totally rebooting the

business to rid itself of RCP. That task required regaining the confidence of regulators and warehouse lenders, and raising $8 million of new subordinated debt. Unfortunately, while these parties supported AFI, they could not get comfortable with an AFI business that continued to carry the risk of RCP's behavior.

13.     And RCP's behavior only got worse. After misleading AFI into believing that it would help AFI avoid liquidation, RCP insisted on a stringent business plan and budgetary controls. It then took actions that crippled AFI's chance of executing the business plan and emancipation from RCP's domination. RCP unreasonably refused to consent to new warehouse lines of credit that it knew were fundamental to AFI's turnaround and delayed approval of operating budgets that, once again, paralyzed AFI's business.

14.     First, RCP swiftly began sweeping most of the company's cash and impaired its ability to pay its obligations rather than allowing AFI to use the cash to fund the business. RCP's wanton sweeps impaired AFI's ability to meet financial requirements of regulators, the GSEs (as defined herein) and Ginne Mae. When AFI implored RCP to release cash for payroll and critical vendors, RCP insisted that AFI agree to new improper concessions solely for the benefit of RCP, including new releases of RCP and giving RCP sole discretionary control over a broker to sell AFI's assets.

15.     RCP's influence over AFI had long since crossed the line of an ordinary borrower-lender relationship, and it became a non-statutory insider of AFI. From the inception of its $50 million subordinated loan, RCP attended monthly AFI board meetings and received all board materials without recusing itself. In sharp contrast to AFI's prior subordinated lender, RCP demanded and received highly detailed internal operating information and reports from AFI that far exceeded typical borrower reporting requirements. RCP had the ability to approve critical

budgets and sweep operating accounts while also having unfettered access to AFI's personnel whom RCP frequently contacted for even more information.

16.    But RCP was unsatisfied and wanted full control, which it accomplished on August 24, 2023, when it took control of AFI's stock under the pledge agreement and installed a slate of new directors who promptly voted to put AFI into an expedited Chapter 11 liquidation (only two hours later) with an RCP-funded DIP loan that was predicated upon a liquidation solely for the benefit of RCP and another set of releases to immunize it from the path of destruction that lays in the wake of its ravaging of AFI.   RCP now stands before the Court as equity owner, prepetition lender and DIP lender.

17.    RCP should be held to account for its conduct.   It knowingly destroyed AFI's business in December 2022 to obtain leverage to manipulate the company to obtain advantages solely for itself at the expense of the company and its unsecured creditors.

18.    This lawsuit seeks to right these wrongs for the benefit of the estate and its general unsecured creditors.

## JURISDICTION AND VENUE

19.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.   Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

20.    This is an adversary proceeding pursuant to Rules 3007(b) and 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").   This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b).

21.    This proceeding contains both core and non-core claims.   Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiff does not consent to the entry of a final order by the Court in

connection with this adversary proceeding as to any non-core claims to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution, and fully reserves its right to a trial by jury with respect to any such claims.

## THE PARTIES

22.     Plaintiff is the Committee appointed by the United States Trustee for Region 3 (the "U.S. Trustee") to represent the interests of all general unsecured creditors in these Chapter 11 Cases pursuant to Section 1102(a)(1) of title 11 of the United States Code (the "Bankruptcy Code").  The members of the Committee are Kristen Rahn, Mortgageshots, LLC and Paragon Micro, Inc.  The Committee selected Todd Cowen of Paragon Micro, Inc. as its chair.

23.     Defendant RCP Credit Opportunities Fund Loan SPV (Fund III), L.P. is the administrative agent and a lender under that certain *Credit and Security Agreement* dated as of April 21, 2021 (as amended or modified from time to time, the "Credit Agreement").

24.     Defendant RCP Customized Credit Fund (Fund IV-A), L.P. is a lender under the Credit Agreement.

## PROCEDURAL BACKGROUND

25.     On August 24, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  The Debtors are managing and operating their businesses as debtors in possession pursuant to Sections 1107(a) of the Bankruptcy Code.  The Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.  No trustee or examiner has been appointed in these Chapter 11 Cases.

26.     On August 29, 2023, the Debtors filed the *Motion of the Debtors for Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Dkt. No. 21] (the "DIP Motion").

27.     On August 31, 2023, following an extended hearing the previous day, the Court entered the Interim DIP Order, approving the DIP Motion on an interim basis.  Pursuant to Paragraph 5(e) of the Interim DIP Order, the Debtors stipulated that RCP has properly perfected continuing liens on and security interests in substantially all of the Debtors' assets.  Paragraph 5(f) of the Interim DIP Order provides that such stipulation shall be binding on the Debtors and "all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Case and any other person or entity acting or seeking to act on behalf of AmeriFirst's estate" unless the Committee or such other party in interest "with requisite standing has timely filed an adversary proceeding or contested matter" by 75 calendar days after entry of the Interim DIP Order (the "Challenge Period").

28.     On September 15, 2023, the Office of the United States Trustee for Region 3 (the "U.S. Trustee") appointed the Committee pursuant to Section 1102 of the Bankruptcy Code.

29.     On November 16, 2023, the Court entered an order [Dkt. No. 435] continuing the hearing to consider the DIP Motion on a final basis to November 21, 2023 through November 22, 2023 and extending the Challenge Period through the date of entry of a final order approving the DIP Motion.

30.     A "Challenge" is defined in Paragraph 5(f) of the Interim DIP Order as:

[A]n adversary proceeding or contested matter . . . (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition

Obligations or the Prepetition Liens, or (B) asserting or prosecuting any avoidance action or any other claims, counterclaims or causes of action, objections, contests or defenses . . . against [RCP] in connection with or related to the Prepetition Loan Documents, the Prepetition Loans, the Prepetition Liens, or the Prepetition Collateral . . . .

31.     Accordingly, pursuant to the Interim DIP Order, subject to the entry of a final order approving the DIP Motion, the Debtors stipulated to the validity of the aggregate amounts of the Prepetition Obligations and the validity, enforceability and priority of the liens and security interests securing the Prepetition Obligations under the Prepetition Loan Documents, unless the Committee or another party in interest brings a timely Challenge such as this.

32.     On October 6, 2023, the Debtors filed a revised proposed final DIP order [Dkt. No. 231], the entry of which would, among other things: (i) authorize the Debtors to borrow an additional $2,225,000 from RCP on a secured basis, for an aggregate amount of $5,000,000; (ii) eliminate the Challenge Period in its entirety; and (iii) grant RCP a first priority lien on the proceeds of avoidance actions.

33.     Based on the Committee's investigation and conclusions as outlined above, on November 21, 2023,[4] the Committee filed its standing motion [Dkt. No. 470] (the "Standing Motion").

34.     On August 14, 2024, the Court entered an order [Dkt. No. 829] (the "Standing Order") granting in part and denying in part the Standing Motion and authorizing the filing of this Complaint.  In light of the filing of the Standing Motion (and the proposed complaint attached thereto) within the Challenge Period, and the Court's issuance of the Standing Order, the various stipulations, admissions, agreements and releases by the Debtors in favor of RCP in the Interim

---

[4]     On November 16, 2023, the Court entered an order [Dkt. No. 435] continuing the hearing to consider the DIP Motion on a final basis to November 21, 2023 through November 22, 2023 and extending the Challenge Period through the date of entry of a final order approving the DIP Motion.

DIP Order or the Final DIP Order are not binding on the Committee or the Debtors' Estates and remain subject to the adjudication of the claims and causes of action alleged herein.

## **FACTUAL BACKGROUND**

### I.    **The RCP Loan and Asset Sales**

35.    On April 21, 2021, AmeriFirst Financial, Inc. ("AFI") as borrower, RCP Credit Opportunities Fund Loan SPV (Fund III), L.P. as administrative agent and lender, and RCP Customized Credit Fund (Fund IV-A), L.P. as lender entered into the Credit Agreement (the "Initial Credit Agreement"), providing for a $50,000,000 loan with a maturity date of February 28, 2025 (the "Loan").  The Loan was guaranteed by AFI's former Chief Executive Officer, Eric Bowlby, and secured by a security interest in the following collateral (the "Initial Prepetition Collateral"):

(a) all of the following (collectively, the "Borrower Account Collateral"): (i) the Collection Account [as defined in the Initial Credit Agreement] and all funds on deposit therein and all certificates and instruments, if any, from time to time representing or evidencing the Collection Account or such funds, (ii) all notes, certificates of deposit and other instruments from time to time delivered to or otherwise possessed by the Administrative Agent or any assignee or agent on behalf of the Administrative Agent in substitution for or in addition to any of the then existing Borrower Account Collateral, (iii) all cash and (iv) all interest, dividends, cash, instruments, investment property and other property from time to time received, receivable or otherwise distributed with respect to or in exchange for any and all of the then existing Borrower Account Collateral; and

(b) to the extent not otherwise included, all proceeds and products of the foregoing and all accessions to, substitutions and replacements for, and profits of, each of the foregoing Collateral (including proceeds that constitute property of the types described in Section 10.01(a) [of the Initial Credit Agreement]).

Initial Credit Agreement § 11.01.  Other than this limited collateral, RCP's Loan was unsecured and subordinated to the debt owed to AFI's senior warehouse lenders.

36.    However, an unprecedented spike in interest rate hikes in 2022 significantly impaired AFI's business resulting in AFI failing to meet a minimum net worth covenant under the

Loan.  AFI had a 90-day cure period to return to covenant compliance.  To do so, AFI proposed to pay down approximately $9 million of the Loan by December 1, 2022.[5]

37.     In or about November 2022 at RCP's request, AFI made arrangements to sell certain non-core assets, including mortgage servicing rights ("MSRs"),[6] to PHH Mortgage (the "Asset Sale") in order to cure the existing covenant violations.  In October, AFI had outlined the Asset Sale plan to its senior warehouse lenders, Texas Capital Bank, Origin Bank, Flagstar Bank, Veritex Community Bank and Western Alliance Bank (the "Warehouse Lenders") and they agreed.  On November 23, 2022, AFI and RCP walked through each potential sale in detail during an hours-long conference call and, on November 30, 2022, RCP executives flew to AFI's Arizona headquarters and spent the day meeting with AFI's management to further negotiate the details of the Asset Sale plan.  As a result of the assurances that RCP gave AFI, AFI proceeded with the Asset Sale plan to cure the covenant violations.

38.     On December 2, 2022, AFI and RCP agreed on a letter of intent (the "LOI") memorializing AFI's commitment to the Asset Sale.  Under the LOI, MSR Asset Vehicle LLC agreed to purchase certain MSRs from AFI for $9.3 million.

## II.     The December 2022 Notice of Default and Irreversible Consequences Thereof

39.     Despite having just approved the terms of the Asset Sale, several hours later, RCP called a default under the Credit Agreement and issued written notices of default to the Warehouse

---

[5]     *Declaration of Eric Bowlby, Former CEO and Majority Shareholder of AFI, in Support of Eric Bowlby's Supplemental Objection to Debtors' Motion for Entry of a Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling A Final Hearing, and (V) Granting Related Relief* ¶ 7 [Dkt. No. 154] (the "Bowlby Declaration").

[6]     Mortgage servicing rights refer to a contractual arrangement where a mortgage servicer purchases from the principal lender the right to service a mortgage—that is, to collect and record payments and forward them to the lender in exchange for a service fee.  MSRs associated with mortgage loans of the types which AFI customarily originated have an embedded profit margin which makes them attractive assets in their own right.

Lenders (the "December 2022 NOD"), making demands never discussed during the previous two months of negotiations.  For example, RCP threatened to accelerate its junior obligations if the Warehouse Lenders did not agree—within a *week*—to "[RCP] being prepaid, in whole or in part, and/or receiving additional security."  A copy of the December 2022 NOD is attached as Exhibit C to the *Motion of the Official Committee of Unsecured Creditors of AmeriFirst Financial, Inc.*, et al. *for an Order Granting (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims on Behalf of the Debtors' Estates and (II) Exclusive Settlement Authority in Respect of Such Claims* [Dkt. No. 470].

40.     The December 2022 NOD had a massive impact on AFI's ongoing business – which RCP clearly intended based on its intimate knowledge of AFI and its business – as well as its ability to meet its present and future obligations, resulting in AFI suffering monetary damages and penalties.

41.     First, AFI's senior Warehouse Lenders accelerated their respective loans, making them due immediately.  RCP knew that AFI could not immediately refinance these loans, which meant that AFI was completely starved of funding capital.

42.     AFI was further forced to discount its MSR sale to PHH Mortgage by approximately 30%, as RCP's December 2022 NOD caused PHH Mortgage to lose faith that AFI would be able to back up its representations and warranties ("reps and warranties") in support of the sale.

43.     AFI was forced to scuttle plans to expand its historically profitable business retail division, which AFI estimated resulted in an annualized loss of $3.6 million in annual profits.

44.     RCP's actions and their consequences rendered AFI insolvent and required a comprehensive restructuring transaction or swift liquidation.  Indeed, by the second week of

December 2022, AFI went into liquidation mode as a result of RCP's bad faith actions, was forced to provide a performance guarantee to another mortgage servicer to protect AFI's customers as well as their pre-approved pipeline loans, and engaged in negotiations with a third mortgage servicer to provide a new home for AFI employees.

45.     On March 27, 2023, Fannie Mae suspended AFI's selling and servicing approvals, prohibiting AFI from selling loans to Fannie Mae and adding additional Fannie Mae loans to AFI's servicing portfolio.  This triggered AFI's contractual obligation to provide notice of such to Freddie Mac and Ginnie Mae, who in turn also suspended AFI's selling and service approvals with each. These suspensions by government-sponsored enterprises Fannie Mae, Freddie Mac and Ginnie Mae (collectively, the "GSEs") created a massive impact on AFI's ability to bring in revenue.

46.     In addition to suspending AFI's selling and servicing approvals, Fannie Mae also imposed a deadline of March 31, 2023, by which date RCP was to waive the December 2022 NOD or Fannie Mae would terminate AFI's seller/servicer license as well as its MSRs.

47.     The catastrophic impact of the December 2022 NOD should not have surprised RCP.  RCP's loan to another mortgage company, Sprout Mortgage ("Sprout"), had previously defaulted and exposed RCP to the unique challenges posed by financial distress of companies in the mortgage space.  Ironically, AFI advised RCP on the Sprout situation and helped RCP mitigate some of its losses.

48.     Accordingly, RCP knew that its precipitous December 2022 NOD would disable AFI's business to the detriment of AFI and its other stakeholders.  RCP then used the leverage of its bad faith NOD (which loomed as the obstacle to AFI resuming business operations) to further entrench its influence over AFI and extract further concessions to benefit itself at the expense of AFI and its other stakeholders.

49.     RCP refused to engage with AFI in good faith, and would not agree to any reasonable terms that would permit AFI to obtain new warehouse financing.  Because the December 2022 NOD caused all of AFI's senior lenders (including the Warehouse Lenders) to cut off financing to AFI, RCP's unyielding refusal to permit new warehouse lines starved AFI of the necessary liquidity to broker or originate loans, bringing AFI's business to a grinding halt.

50.     Due to RCP's unwillingness to permit a new warehouse lender to come in on reasonable terms, AFI was forced to rent a warehouse financing line for its business purpose lending division through another lender, Oaktree Funding ("Oaktree"), at the steep rate of approximately $100,000 per month, further negatively impacting AFI's profit margins and its liquidity.

51.     RCP's obstreperousness left AFI without a new warehouse financing line for its residential mortgage business for nearly two months, costing it approximately $2,000,000 in revenue and preventing it from meeting the pro forma specified in the Prepetition Credit Agreement signed on May 15. AFI was only able to obtain warehouse financing for its residential mortgage because Oaktree also agreed to backstop its residential warehouse line as well.

52.     In total, RCP's December 2022 NOD cost AFI approximately $730,000 per month in additional expenses and loss of revenue on the business lending side alone.  As to RCP's residential mortgage division, the December 2022 NOD cost AFI approximately $6,500,000 in gross monthly revenues.  Perhaps more importantly, RCP's actions caused AFI to lose approximately 50% of its employed loan originators, greatly diminishing its talent pool.

53.     AFI repeatedly attempted to contact RCP to have it rescind the December 2022 NOD, including multiple telephone calls and emails, as well as Mr. Bowlby flying to RCP's New

York offices to discuss AFI's proposal to right the ship. All of these entreaties were largely ignored by RCP.

54.     On January 11, 2023, RCP issued a second notice of default (the "January 2023 NOD"), asserting substantially the same events of default as the December 2022 NOD.

55.     Although AFI's senior warehouse lenders had accelerated their own respective loans as a result of the December 2022 NOD, their patience and willingness to work with AFI – in stark contrast to RCP's conduct – allowed AFI sufficient time to liquidate enough assets to pay them off in full by February 2023. This is exactly what RCP intended. By forcing the payoff of the warehouse lenders, RCP would fill the void and have first-priority liens on all of AFI's assets.

56.     It was clear that AFI would be unable to continue its business and its mortgage assets would continue to diminish in value without a new warehouse loan. Having paralyzed AFI's business, RCP knew that it could extract further concessions to benefit itself at the expense of all other stakeholders, while blocking AFI from obtaining a new warehouse loan.

57.     This was accomplished through a May 15, 2023 "settlement" between AFI and RCP that was outrageously one-sided and essentially set the table for this Chapter 11 liquidation to benefit RCP in a cynical gambit to extract valuable releases for its bad faith conduct.

## III.    The May 2023 Agreements

58.     In March 2023, RCP contacted AFI to renegotiate financing. RCP did so only after AFI had already suffered irreversible losses, undertaken significant costs to protect its employees and consumers from the disruption caused by RCP, and ultimately become insolvent.

59.     AFI and RCP signed a term sheet on March 31, 2023 (the "March 2023 Term Sheet"). As of the date of the March 2023 Term Sheet, AFI owed RCP $28 million of the original $50 million principal Loan amount.

60.     Pursuant to the March 2023 Term Sheet, RCP and AFI agreed to amend and restate the Initial Credit Agreement, and RCP agreed to take no action with respect to the December 2022 NOD or the January 2023 NOD, and otherwise forbear from exercising remedies for existing defaults under the Initial Credit Agreement, pending the execution of the amended and restated Credit Agreement.

61.     On May 15, 2023, AFI and RCP entered into a series of agreements, including but not limited to, the *Amended and Restated Credit and Security Agreement* (the "Prepetition Credit Agreement"), a pledge agreement (the "Pledge Agreement"), the *Limited Waiver and Second Amendment to Credit and Security Agreement* (the "Limited Waiver"), a security agreement (the "Security Agreement"), a side letter (the "Side Letter") and a settlement agreement (the "Settlement Agreement" and, collectively with the Prepetition Credit Agreement, the Pledge Agreement, the Limited Waiver and the Security Agreement, the "May 2023 Agreements").

62.     Under the May 2023 Agreements:

a.      AFI, including Mr. Bowlby and other related persons, released RCP for any and all claims arising out of the Credit Agreement or any documents related thereto (including claims that two litigation funding sources informed Mr. Bowlby to be worth between $50 to $100 million based upon RCP's misconduct in connection with the December 2022 NOD);

b.      RCP obtained first-priority liens on substantially all of AFI's assets,[7] including new contractual cash concentration rights and a new deposit account control agreement ("DACA") that would provide RCP with lockbox control over AFI's cash;[8]

c.      AFI's shareholders pledged their equity ownership of AFI as collateral security for the Prepetition Credit Agreement, and further agreed to appoint RCP as proxy and attorney-in-fact for such collateral, *provided that* RCP

---

[7]     *See* Security Agreement § 1.

[8]     *See* Prepetition Credit Agreement § 10.04.

would be able to vote such collateral only "upon the occurrence of an Event of Default and so long as [the Event of Default] is continuing";[9]

d.      RCP was provided with strict control over AFI's business through approved budgets and extensive reporting obligations by AFI to RCP;[10]

e.      RCP was provided consent rights, including with respect to the terms of new warehouse loans;[11]

f.      AFI was required to make a $20 million paydown payment to RCP by September 16, 2023 (or October 16, 2023, if AFI made a $13 million prepayment by July 7, 2023);

g.      RCP agreed to waive any previous defaults and effectively rescinded the December 2022 NOD and the January 2023 NOD;[12] and

h.      If AFI made the required prepayments, then RCP conditionally agreed to (i) waive certain outstanding interest and penalties owed on the Loan, and (ii) convert the remaining $8 million principal amount of the Loan into a combination of preferred equity interests in AFI and certain "hope notes."[13]

63.     The May 2023 Agreements provided AFI with little more than a short runway to accomplish the herculean task of totally rebooting the business to rid itself of RCP. That task required regaining the confidence of regulators and warehouse lenders, and raising $8 million of new subordinated debt. There was no room for error, and the plan would only work if RCP behaved in a commercially reasonable manner. Unfortunately, RCP's behavior only got worse.

## IV.    Events Preceding the Petition Date

64.     Nearly immediately after the execution of the May 2023 Agreements, on May 25, 2023, RCP withdrew approximately $5,000,000 from AFI's Collection Account, despite knowing

---

[9]     *See* Pledge Agreement ¶ 7.

[10]    *See* Prepetition Credit Agreement § 5.01.

[11]    *See id.* § 5.17.

[12]    *See generally* Limited Waiver.

[13]    *See* Prepetition Credit Agreement § 2.09.

that such a sweep would leave AFI dangerously undercapitalized and unable to pay its essential

obligations (including office rent, financing payments, and payroll) on time.

65. Only one month later, on June 29, 2023, RCP withdrew $3,258,313.00 from AFI's

Collection Account, again notwithstanding RCP's own knowledge as to the drastic impact this

would have, as well as AFI's strenuous objections and warnings regarding the same.  This also

placed AFI in violation of its liquidity covenants with the GSEs, preventing it from complying

with the GSEs' stipulated conditions for restoring AFI's selling and servicing rights (and, by

extension, another major revenue stream).

66. In contravention of its obligations under Section 10.05(b) of the Prepetition Credit

Agreement, RCP notified AFI that it would not be providing funds for AFI to meet its August 5

payroll obligations only about one hour before the payroll deadline, unless AFI signed a release of

all its claims against RCP.  This left AFI with a $200,000 shortfall to make payroll, which Mr.

Bowlby covered by borrowing money from a friend.

67. At the next August payroll deadline, RCP again informed AFI that it would not

provide funds for AFI to meet payroll unless AFI would agree to several extortionate terms.  RCP's

proposed terms included: the execution of a universal mutual claims release, presumably intended

primarily to extinguish RCP's massive liability to AFI for its bad faith breaches of the May 2023

Agreements; a requirement that AFI immediately put up for sale MSRs for approximately $873

million of GSE loans which, despite holding a $12 million book value, received only risk-

discounted offers of approximately $9 million, thus requiring AFI to take a $3 million loss; a

further requirement that RCP be given sole control over this proposed MSR sale[14] and that AFI

---

[14]   As explained above, RCP's December 2022 NOD circulation made prospective buyers extremely wary of
purchasing loans from AFI, diminishing their trust that AFI had the ability to take responsibility for the necessary
reps and warranties associated with the loan sales.  Giving RCP control of the proposed MSR sale would have

hold RCP harmless for any losses incurred thereby; and a demand that Mr. Bowlby take himself and others off payroll indefinitely.

68.    In a show of good faith to RCP, AFI removed all individuals requested by RCP from payroll, anticipating that it could negotiate the other terms with RCP.  However, RCP refused to budge on its other terms, which clearly undercut the best interests of AFI, and walked away from negotiations twenty minutes only before the payroll deadline.[15]

69.    AFI then scrambled to raise funds from other sources to cover AFI's payroll shortfall, which was secured by a mortgage on Mr. Bowlby's personal residence.

70.    In addition to payroll, RCP refused to fund various other vendors who are now general unsecured creditors in these Chapter 11 cases.  These included vendors providing software and other items critical to AFI's business.

71.    Following RCP's refusal to fund payroll as required under the Prepetition Credit Agreement, on August 22, 2023, AFI, through its counsel, issued a formal Notice of Default to RCP (the "AFI Notice"), laying out in detail RCP's bad faith actions constituting material breaches under: (i) Sections 5.01(e) (adoption of Approved Budgets) and 10.05(b) (disbursement of funds in AFI's Collection Account) of the Prepetition Credit Agreement; (ii) the Side Letter, which provides that RCP "shall . . . execute any and all amendments or waivers, as applicable, to the terms of the Credit Agreement or other Loan Documents which are required to be amended or waived to ensure that the Borrower . . . remains compliant with all Agency requirements applicable to Borrower;" and (iii) RCP's fiduciary duties as an equity holder of AFI.  The AFI Notice also

---

signaled to all prospective buyers that this was a distress sale and would have resulted in heavily discounted offers, thus forcing AFI to take massive losses thereby.

[15] Notably, although RCP failed to take over the MSR sale and obtain a release from AFI as to any losses that would be incurred therefrom, RCP nevertheless ultimately achieved substantially the same result when it conducted the hostile takeover on the Petition Date and forced AFI into bankruptcy under the direction of RCP officers and agents.

notified RCP of AFI's intention to litigate its rights under the various Agreements if RCP did not immediately cure its blatant and material breaches.

72.     Two days after the AFI Notice was issued, on August 24, 2023—that is, the Petition Date—RCP issued its own reciprocal Notice of Default to AFI (the "RCP Notice").

73.     Notably, the RCP Notice failed to cite any specific dates or events constituting Events of Default as required by the Prepetition Credit Agreement.  Moreover, the RCP Notice mischaracterized the AFI Notice's underlying substance as somehow "challeng[ing] the enforceability of Section 10.05(b)," when, in fact, the AFI Notice sought to enforce AFI's rights pursuant to Section 10.05(b) of the Prepetition Credit Agreement.

74.     RCP arranged to "hand-deliver" the RCP Notice that same day, by way of a team of RCP employees and agents accompanied by multiple guards armed with guns.  In other words, RCP used delivery of the RCP Notice as a manufactured excuse to lock down AFI headquarters and to forcibly confine the CEO, and AFI's officers and employees, while its team changed locks, company passwords, IT access, and took other means to wrest away total control of the company.

75.     Further evidencing the plotting nature of RCP's plan, the RCP Notice and the filing of these bankruptcy cases occurred mere days after expiration of the 90-day preference period following the May 2023 Agreements.  Ignoring its insider status, RCP apparently believed this timing would shield the settlement and resulting cash sweeps and other actions from avoidance.

76.     It is clear that RCP never intended to live up to the May 2023 Agreements, particularly the provisions designed to provide AFI with an opportunity to restart its business. Instead, RCP took advantage of AFI's sincere desire to reboot its business to mislead AFI to enter into the May 2023 Agreements to provide RCP with unwarranted releases, liens, a stock pledge and other benefits that set the stage for the final act of RCP's plan – the takeover of AFI and the

bankruptcy filing and insider DIP to extract releases and all remaining value in AFI ahead of all other fellow unsecured creditors. It ensured that result by starving AFI of all cash and manufacturing a default under the May 2023 Agreements to take full control of AFI for its own sole benefit.

## V. RCP's Insider Status

77.     RCP's influence over AFI had long since crossed the line of an ordinary borrower-lender relationship, and it became a non-statutory insider of AFI. From the inception of its $50 million subordinated Loan, RCP attended monthly AFI board meetings and received all board materials without recusing itself. In sharp contrast to AFI's prior subordinated lender (who did not attend board meetings), RCP demanded and received highly detailed internal operating information and reports from AFI that far exceeded typical borrower reporting requirements. RCP had unfettered access to AFI's personnel and frequently contacted them for even more information.

78.     RCP misused its perceived leverage from the December 2022 NOD to further increase its undue influence over AFI and its business. After misleading AFI into believing that it would help AFI avoid liquidation, RCP insisted on a stringent business plan and budgetary controls pursuant to the May 2023 Agreements – agreements with which RCP never intended to comply. It then took actions that crippled AFI's chance of executing the business plan and emancipation from RCP's domination. RCP unreasonably refused to consent to new warehouse lines of credit that it knew were fundamental to AFI's turnaround and delayed approval of operating budgets that, once again, paralyzed AFI's business.

79.     RCP's wanton sweeps of the company's cash impaired AFI's ability to pay its obligations. These sweeps also impaired AFI's ability to meet financial requirements of regulators, the GSEs and Ginne Mae. When AFI implored RCP to release cash for payroll and critical vendors,

RCP insisted that AFI agree to new improper concessions solely for the benefit of RCP, including new releases of RCP and giving RCP sole discretionary control over a broker to sell AFI's assets.

80.     But RCP was unsatisfied and wanted full control, which it accomplished on August 24, 2023, when it took control of AFI's stock under the pledge agreement and installed a slate of new directors who promptly voted to put AFI into an expedited Chapter 11 liquidation only two hours later with an RCP DIP predicated upon another set of releases and a liquidation solely for the benefit of RCP.  RCP now stands before the Court as equity owner, prepetition lender and proposed DIP lender and asks the Court to immunize it from the path of destruction that lays in the wake of its ravaging of AFI over the last year.

81.     RCP should be held to account for its conduct.  It knowingly destroyed AFI's business in December 2022 to obtain leverage to manipulate the company to obtain advantages solely for itself at the expense of the company and its unsecured creditors and other stakeholders.

## VI.     RCP's Perfection of its Liens

82.     The Security Agreement is governed by, and shall be construed and enforced in accordance with, the laws of the state of New York.[16]  Section 9-301 of the New York Uniform Commercial Code looks to the law of the state in which the debtor is located to govern perfection of a security interest.[17]  A debtor is located in its state of incorporation or organization.[18]  AFI is incorporated in Arizona and, therefore, is located in Arizona for purposes of the Security Agreement.

83.     Under Chapter 9 of the Arizona Uniform Commercial Code (the "Arizona UCC"), a security interest is enforceable if (i) value has been given, (ii) the debtors have rights in the

---

[16]    Security Agreement § 22.

[17]    N.Y. U.C.C. Law § 9-301.

[18]    N.Y. U.C.C. Law § 9-307(e).

collateral or the power to transfer rights in the collateral to a secured party and (iii) the debtors have authenticated a security agreement that provides a description of the collateral.[19]

84.     Under the Arizona UCC, a security interest in a deposit accounts is perfected only by "control" of the collateral by the secured party.[20]  To obtain control over a deposit account, the secured party must either be the depository bank or agree in an authenticated record that the secured party is authorized by the debtor and the bank to dispose of the funds in the account without further consent by the debtor.[21]

85.     Pursuant to the Credit Agreement, AFI granted RCP a security interest in a deposit account maintained at Western Alliance Bank.  On April 21, 2021, AFI, RCP and Western Alliance Bank executed a DACA to perfect RFI's security interest in such deposit account.

86.     Pursuant to Section 5 of the Security Agreement, three deposit accounts are included in RCP's current collateral under the Credit Agreement: one maintained with Veritex Community Bank ("Veritex") (account number 55016854145) and two maintained with JPMorgan Chase ("Chase") (account numbers 849974191 and 3829363952).

87.     On August 18, 2022, Veritex, AFI and RCP executed a DACA to perfect RCP's security interest in the Veritex account.

88.     Upon information and belief, AFI and RCP did not execute a DACA with Chase to perfect RCP's security interest in the Chase accounts.  In addition, the Committee has not received copies of any DACAs for any bank account listed on Schedule 3.23 to the Credit Agreement.

89.     Unless DACAs exist with respect to these accounts, RCP does not have a perfected security interest in the accounts (collectively, the "Unperfected Deposit Accounts").

---

[19]   Ariz. Rev. Stat. Ann. § 47-9203.

[20]   Ariz. Rev. Stat. Ann. § 47-9312.

[21]   *Id.* § 47-9104.

## CAUSES OF ACTION[22]

### COUNT I
### Avoidance of Fraudulent Transfers
(11 U.S.C. § 544(b), and applicable state law including the Uniform Fraudulent Transfer Act as enacted in Delaware, Arizona and/or New York)

90.     The Committee restates and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

91.     Pursuant to Section 544(b) of the Bankruptcy Code, the Debtors, the bankruptcy trustee and the Committee (acting on behalf of the Estates) "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim . . . ."  The phrase "under applicable law" has been interpreted to include any applicable fraudulent transfer laws that would govern potentially fraudulent transactions.   Delaware, New York and Arizona have all adopted the Uniform Fraudulent Transfers Act ("UFTA").

92.     Section 1307 of the Delaware UFTA, Section 44-1007 of the Arizona UFTA, and Section 276 of the New York UFTA each provides that a creditor may obtain "[a]voidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim."

93.     Section 1304(a)(2) of the Delaware UFTA, Section 44-1004(a)(2) of the Arizona UFTA, and Section 273 of the New York UFTA each provides that a transfer is fraudulent as to a creditor if the debtor made the transfer or obligation "without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor" (a) "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction" or (b) "intended to incur, or believed

---

[22]   Certain causes of action that the Committee was denied standing to pursue (Counts V, VI, VIII, IX, X and XI) are included in this Complaint notwithstanding the Standing Order out of an abundance of caution to preserve the Committee's appellate rights with respect to such causes of action.

or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."

94.     Section 1305(a) of the Delaware UFTA, Section 44-1005 of the Arizona UFTA, and Section 274 of the New York UFTA each provides that a transfer is fraudulent as to present creditors (*i.e.*, those whose claim arose before the transfer) if the debtor "made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."

95.     Pursuant to the May 2023 Agreements, AFI made various transfers and incurred burdensome obligations to RCP.  Among other things, AFI (a) released any and all claims against RCP relating to the Credit Agreement, (b) provided RCP with first-priority liens on substantially all of AFI's assets, (c) incurred strict reporting obligations to RCP, (d) bestowed consent rights and control rights to RCP over AFI's operations and financial decisions, and (e) incurred mandatory Loan paydown obligations to RCP (collectively, the "Obligations").

96.     In addition and as a result of the May 2023 Agreements, AFI made the following transfers to or for the benefit of the Defendants (collectively, the "Transfers"):

       a.     $5,000,000 on May 25, 2023;

       b.     $3,258,313 on June 29, 2023; and

       c.     $593,000 on August 17, 2023.

97.     Each of the Transfers constituted a transfer of an interest in AFI's property.

98.     At the time that and after each of the Obligations was incurred and each of the Transfers was made, AFI had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

99.     Each Obligation was incurred and each Transfer was made in exchange for less than fair consideration and less than reasonably equivalent value.

100.    AFI was insolvent at the time of, or became insolvent as a result of, the Obligations and the Transfers.

101.    At the time each Obligation was incurred and each Transfer was made, AFI was engaged or were about to engage in a business or transaction for which AFI's remaining assets were unreasonably small in relation to the business or transaction.

102.    At the time each Obligation was incurred and each Transfer was made, AFI intended, believed, or reasonably should have believed that AFI would incur debts beyond its ability to pay such debts as they became due.

103.    AFI neither received reasonably equivalent value in exchange for entry into the May 2023 Agreements nor any meaningful benefit from the May 2023 Agreements.  Ultimately, the May 2023 Agreements crippled AFI's business, drained AFI of all of its available cash, drove AFI to insolvency and left AFI with no recourse due to the releases provided by the May 2023 Agreements.

104.    Accordingly, the May 2023 Agreements in total, including, for the avoidance of doubt, any and all liens, security interests, obligations and transfers associated therewith or arising therefrom (collectively, the "Fraudulent Transfers"), were fraudulent transfers avoidable under (a) applicable state law by a creditor holding an unsecured claim that is allowable under Section 502 of the Bankruptcy Code and (b) Section 548(a)(1)(B) of the Bankruptcy Code.  Therefore, the Committee is entitled to avoid the Fraudulent Transfers pursuant to Sections 544 and 548 of the Bankruptcy Code.

**COUNT II**
**Avoidance of Certain Amounts Transferred for the Benefit of Defendants During the**
**Preference Period as Fraudulent Transfers**
(11 U.S.C. § 547)

105.    The Committee restates and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

106.    Section 547(b) of the Bankruptcy Code permits a debtor to avoid a transfer of an interest in property of the debtor's estate if the following conditions have been met: (a) the transfer was made to or for the benefit of a creditor; (b) the transfer was for or on account of an antecedent debt; (c) the transfer was made while the debtor was insolvent; (d) the transfer was made within the 90 days prior to the petition date; and (e) the transfer enabled the creditor to receive more in a chapter 7 liquidation than it would receive had the transfer not been made.

107.    Upon information and belief, approximately $3,851,313 in unencumbered cash was transferred to the Defendants during the 90 days prior to the Petition Date (the "Preference Assets").

108.    The Preference Assets were transferred to, and for the benefit of, the Defendants on account of AFI's obligations under the May 2023 Agreements.

109.    AFI was insolvent at all times during the 90 days prior to the Petition Date.

110.    Upon information and belief, the transfers of the Preference Assets (the "Preference Transfers") to the Defendants reduced the amount by which the Defendants were undersecured, thereby allowing the Defendants to receive more than they would in a hypothetical chapter 7 liquidation had the Preference Assets not been transferred.

111.    The Preference Transfers were made on or within 90 days before the Petition Date.

112.    Accordingly, the Preference Transfers and any liens on and security interests in the Preference Assets should be avoided pursuant to Section 547 of the Bankruptcy Code.

**COUNT III**

**Avoidance of Certain Amounts Transferred for the Benefit of Defendants During the Insider Preference Period as Fraudulent Transfers**

(11 U.S.C. §§ 547 and 548(a)(1)(B), and applicable state law including the Uniform Fraudulent Transfer Act as enacted in Delaware, Arizona and/or New York)

113.    The Committee restates and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

114.    Section 547(b) of the Bankruptcy Code permits a debtor to avoid a transfer of an interest in property of the debtor's estate within one year before the date of the filing of the petition if the following conditions have been met: (a) the transfer was made to or for the benefit of a creditor; (b) the transfer was for or on account of an antecedent debt; (c) the transfer was made while the debtor was insolvent; and (d) such creditor was an insider.

115.    Section 548(a)(1)(B) of the Bankruptcy Code permits a debtor to avoid any transfer of an interest of the debtor, or any obligation incurred by the debtor, to or for the benefit of an insider, that was made or incurred on or within two years prior to the petition date if the debtor (i) voluntarily or involuntarily received less than a reasonably equivalent value in exchange for such transfer or obligation and (ii) (a) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer, (b) was engaged or about to engage in business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction, or (c) intended to incur or believed it would incur debts beyond its ability to pay as such debts matured.

116.    Similarly, Section 1305(b) of the Delaware UFTA, Section 44-1004 of the Arizona UFTA, and Section 274(b) of the New York UFTA each provides that a transfer is fraudulent as to present creditors (*i.e.*, those whose claim arose before the transfer) "if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent."

117.    The definition of an "insider" under Section 101(31)(B) of the Bankruptcy Code includes a "person in control of the debtor."

118.    Actual control over the Debtor is not necessary in order for a creditor to be deemed a non-statutory insider where there is a sufficiently close relationship between the creditor and the debtor and evidence that the transfers were not conducted at arms' length.

119.    Since entry into the Initial Credit Agreement in 2021, RCP attended AFI board meetings, had unfettered access to any and all of AFI's confidential board materials and financial documents, and received highly detailed internal operating reports from AFI that far exceeded typical borrower reporting requirements.  RCP was not a typical lender to AFI; it was a non-statutory insider.

120.    Upon information and belief, $10,301,067.43 in unencumbered cash was transferred to the Defendants during the year prior to the Petition Date while the Defendants were non-statutory insiders of AFI (the "Insider Preference Assets").

121.    The Insider Preference Assets were transferred to, and for the benefit of, the insider-Defendants, and the obligations of the May 2023 Agreements were incurred for the benefit of the insider-Defendants, on account of AFI's obligations under the Credit Agreement (the foregoing transfers and obligations, collectively, the "Insider Preference Transfers").

122.    All of the Insider Preference Transfers were made at times when AFI was insolvent.

123.    Upon information and belief, the Insider Preference Transfers reduced the amount by which the Defendants were undersecured, thereby allowing the Defendants to receive more than they would in a hypothetical chapter 7 liquidation had the Insider Preference Assets not been transferred.  Further, the Insider Preference Transfers relating to the May 2023 Agreements

crippled AFI's business, drained AFI of all of its available cash, drove AFI to insolvency and left AFI with no recourse due to the releases provided by the May 2023 Agreements.

124.    Accordingly, the Insider Preference Transfers, including any liens on and security interests in the Insider Preference Assets, and including the May 2023 Agreements and the Fraudulent Transfers related thereto, should be avoided pursuant to Sections 547 and 548 of the Bankruptcy Code.

**COUNT IV**
**Recovery of Fraudulent Transfers**
(11 U.S.C. § 550)

125.    Under Section 550(a) of the Bankruptcy Code, "[e]xcept as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from -- (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee."

126.    On information and belief, each Defendant was the initial transferee of one or more of the Fraudulent Transfers, the Preference Transfers and the Insider Preference Transfers set forth above (collectively, the "Avoidable Transfers"), the entity for whose benefit one or more of the Avoidable Transfers was made, or an immediate or mediate transferee of the subject Avoidable Transfers.

127.    To the extent that one or more of the Avoidable Transfers is avoided as set forth above pursuant to Sections 544 and 548 of the Bankruptcy Code, the Committee may recover the property transferred, or the value of the transferred property, from the Defendants pursuant to Section 550(a) of the Bankruptcy Code.

128.    The Committee seeks to recover damages from the Defendants on behalf of the Debtors' estates in an amount equal to the dollar value of the property transferred pursuant to each of the Avoidable Transfers as of the date of the transfer, together with interest on that amount from the date of the transfer, attorneys' fees, and costs of suit and collection allowable by law.

**COUNT V**
**Fraud and Fraudulent Inducement**

129.    The Committee restates and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

130.    RCP intentionally made material misrepresentations of fact in connection with the May 2023 Agreements.  Among other material misrepresentations, RCP claimed that it would work with AFI toward a reasonable path forward with the warehouse loans and business generally; that RCP would forbear from taking any more actions that would negatively impact AFI's business; and that RCP would be reasonable in its budget approvals.

131.    Each of those representations was false.  RCP had no intention of adhering to or delivering on any of its representations and, to the contrary, had a preconceived and undisclosed intent to violate them following the execution of the May 2023 Agreements.  By the time AFI realized the falsity of these representations, however, RCP was already in complete control of AFI.

132.    RCP made each of the foregoing misrepresentations with knowledge of their falsity.

133.    RCP made each of the foregoing misrepresentations with the intent to induce AFI into the May 2023 Agreements.

134.    In reasonable reliance upon and due to RCP's fraudulent and material misrepresentations, AFI entered into the May 2023 Agreements.  AFI would not have agreed to enter into the May 2023 Agreements but for RCP's misrepresentations.

135.    As a direct result of RCP's knowing and willful fraud, the Debtors have been irreparably damaged in an amount to be determined at trial.  Because RCP's fraud was willful, the Debtors' estates are also entitled to punitive damages.

136.    Moreover, the May 2023 Agreements are void and should be rescinded as fraudulently induced.

**COUNT VI**
**Breach of Covenant of Good Faith and Fair Dealing**
(New York law)

137.    The Committee restates and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

138.    As alleged above, AFI entered into a series of agreements, including but not limited to, the Initial Credit Agreement on April 21, 2021 and the Prepetition Credit Agreement on May 15, 2023.

139.    Under New York law, a covenant of good faith and fair dealing is implied in every contract.

140.    RCP breached this covenant by withholding AFI's access to cash and warehouse lines of credit, thereby ensuring the destruction of AFI's business.

141.    By reason of the foregoing, AFI is entitled to damages to be determined at trial and such other and further relief as the Court may deem proper.

**COUNT VII**
**Equitable Subordination of RCP's Claims Against Any Debtor**
(11 U.S.C. § 510)

142.    The Committee restates and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

143.    RCP was at all relevant times an "insider" of the Debtors under the definition set forth in 11 U.S.C. § 101(31) and applicable case law.

144.   RCP engaged in inequitable conduct by, among other things and as further explained herein, issuing a bad faith notice of default in order to assume control over AFI, destroy AFI's business, and push the Debtors into a liquidation.

145.   RCP's inequitable conduct directly resulted in injury to the general unsecured creditors of the Debtors, all while conferring an unfair advantage upon RCP.  Specifically, RCP's conduct enabled it to substantially improve its position in the Debtors' capital structure, obtain valuable releases, and force the Debtors into a liquidation in which RCP could extract releases and all remaining value in the Debtors ahead of all other unsecured creditors.

146.   Equitable subordination of RCP's claims against any Debtor is consistent with the provisions of the Bankruptcy Code and applicable case law.

147.   By reason of the foregoing, the Committee is entitled to judgment equitably subordinating RCP's claims against any Debtor to all of the Debtors' general unsecured claims.

**COUNT VIII**
**Declaratory Judgment that the Unperfected Deposit Accounts Are Unencumbered**
(28 U.S.C. §§ 2201, 2202; Ariz. Rev. Stat. §§ 47-9104, 47-9312)

148.   The Committee restates and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

149.   The definition of "Collateral" under Section 1 of the Security Agreement includes "all money and all Deposit Accounts, together with all amounts on deposit from time to time in such Deposit Accounts."

150.   Under the Arizona UCC, a security interest in a deposit account may be perfected only by "control" and a secured party only has control of a deposit account if it is the bank with which the deposit account is maintained or if the debtor, the secured party and the bank have entered into a DACA.

151.    On information and belief, none of the following deposit accounts are subject to a
DACA between AFI, RCP and the respective bank holding the account:

        a.        Account #8010574484 at Alliance Bank of Arizona

        b.        Account #8011367714 at Alliance Bank of Arizona

        c.        Account #8876034044 at Alliance Bank of Arizona

        d.        Account #8212218051 at Alliance Bank of Arizona

        e.        Account #8397370270 at Alliance Bank of Arizona

        f.        Account #8721554271 at Alliance Bank of Arizona

        g.        Account #8381922288 at Alliance Bank of Arizona

        h.        Account #8495132949 at Alliance Bank of Arizona

        i.        Account #8423191398 at Alliance Bank of Arizona

        j.        Account #8099007385 at Alliance Bank of Arizona

        k.        Account #4811448588 at BMO Harris Bank N.A.

        l.        Account #849974209 at Chase Bank

        m.        Account #849974191 at Chase Bank

        n.        Account #973676620 at Chase Bank

        o.        Account #185637122 at Chase Bank

        p.        Account #849974217 at Chase Bank

        q.        Account #3659929872 at Chase Bank

        r.        Account #3829363952 at Chase Bank

        s.        Account #132330341 at Flagstar Bank

        t.        Account #132330359 at Flagstar Bank

        u.        Account #5490104352 at Wells Fargo

v.    Account #192552261 at Chase Bank

w.    Account #2938353739 at Chase Bank

152.    Accordingly, an actual, substantial and justiciable controversy exists between the Committee and Defendants concerning whether Defendants have valid or perfected liens on or security interests in the Unperfected Deposit Accounts.

153.    Such a controversy is sufficient to warrant the issuance of a declaratory judgment that, notwithstanding the Debtors' stipulations to the contrary, the Defendants do not have a lien on or security interest in any of the Unperfected Deposit Accounts.

**COUNT IX**
**Avoidance of Unperfected Liens and Security Interests**
**with Respect to the Unperfected Deposit Accounts**
(11 U.S.C. §§ 544, 550 and 551)

154.    The Committee restates and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

155.    The Defendants do not have validly perfected liens on the Unperfected Deposit Accounts.

156.    Such unperfected liens may be avoided under Section 544(a) of the Bankruptcy Code for the benefit of the Debtors' Estates.

157.    Any lien avoided under Section 544 of the Bankruptcy Code is recovered for the benefit of the Debtors' Estates pursuant to Section 550(a) of the Bankruptcy Code and/or automatically preserved for the benefit of the Debtors' Estates pursuant to Section 551 of the Bankruptcy Code.

## COUNT X
### Tortious Interference with Contractual Relationships
(New York, Delaware and Arizona law)

158.    The Committee restates and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

159.    AFI entered into valid and enforceable contracts with its vendors and warehouse lenders.

160.    RCP had knowledge of AFI's contractual relationships with its vendors and warehouse lenders.

161.    RCP issued the December 2022 NOD and subsequently starved AFI of cash and refused to consent to new warehouse lines of credit.

162.    As a direct result of RCP's interference, AFI could not satisfy its obligations to critical vendors and the warehouse lenders were forced to cease lending.

163.    RCP was fully aware that AFI could not obtain warehouse financing with RCP's consent and could not pay critical vendors without access to sufficient cash.  Based on RCP's intimate knowledge of AFI and its business, RCP intentionally procured breaches of AFI's contracts with its vendors and warehouse lenders.

164.    By reason of the foregoing, AFI is entitled to damages to be determined at trial and such other and further relief as the Court may deem proper.

## COUNT XI
### Tortious Interference with Business Relationships
(New York, Delaware, and Arizona law)

165.    The Committee restates and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

166.   In the alternative, if the Court finds that there was not a valid and enforceable contract between AFI and its vendors and warehouse lenders, RCP tortiously interfered with the prospective business relationships between AFI and its vendors and warehouse lenders.

167.   AFI enjoyed business relationships with its vendors and warehouse lenders.

168.   RCP had knowledge of AFI's business relationships with its vendors and warehouse lenders.

169.   RCP issued the December 2022 NOD and subsequently starved AFI of cash and refused to consent to new warehouse lines of credit.

170.   As a direct result of RCP's interference, the warehouse lenders were forced to cease lending and AFI could not satisfy its obligations to critical vendors.

171.   RCP was fully aware that AFI's business could not survive without uninterrupted access to warehouse lines of credit and cash for critical vendors.  Based on RCP's intimate knowledge of AFI and its business, RCP intentionally disrupted or terminated AFI's relationships with its vendors and warehouse lenders.

172.   By reason of the foregoing, AFI is entitled to damages to be determined at trial and such other and further relief as the Court may deem proper.

## **PRAYER FOR RELIEF**

173.   WHEREFORE, by reason of the foregoing, Plaintiff requests that the Court enter an order:

    a.   Avoiding and recovering the Avoidable Transfers pursuant to Sections 544, 547, 548 and 550 of the Bankruptcy Code and applicable state law;

    b.   Equitably subordinating Defendants' claims against the Debtors pursuant to Section 510 of the Bankruptcy Code;

    c.   Declaring that the Unperfected Deposit Accounts are unencumbered;

d.      Avoiding Defendants' unperfected liens on or security interests in the Unperfected Deposit Accounts;

e.      Voiding and rescinding the May 2023 Agreements as fraudulently induced;

f.      Awarding Plaintiff all damages available at law, including compensatory and punitive damages;

g.      Awarding Plaintiff reimbursement of its costs and disbursements in connection with this action, including attorneys' fees; and

h.      Such other and further relief as this Court may deem just and proper.

Dated: January 8, 2025
Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Robert J. Dehney, Sr.*
Donna L. Culver (No. 2983)
Robert J. Dehney, Sr. (No. 3578)
Eric D. Schwartz (No. 3134)
Daniel B. Butz (No. 4227)
Casey B. Sawyer (No. 7260)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989
Email: dculver@morrisnichols.com
          rdehney@morrisnichols.com
          eschwartz@morrisnichols.com
          dbutz@morrisnichols.com
          csawyer@morrisnichols.com

**COUNSEL FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

- and -

**GLENN AGRE BERGMAN & FUENTES LLP**
Andrew K. Glenn (admitted *pro hac vice*)
Kurt A. Mayr (admitted *pro hac vice*)
Malak S. Doss (admitted *pro hac vice*)
1185 Avenue of the Americas, 22nd Floor
New York, New York 10036
Telephone: (212) 970-1600
Email: aglenn@glennagre.com
          kmayr@glennagre.com
          mdoss@glennagre.com

**SPECIAL LITIGATION COUNSEL FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**